1
2
3
4
5
6
7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   MARC ANTHONY DONIAS,                    No.  2:16-CV-2674-DMC-P

12                    Petitioner,

13        v.                                 <u>MEMORANDUM OPINION AND ORDER</u>

14   RAYTHEL FISHER,

15                    Respondent.

16

17            Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to the written consent of all parties (ECF

19   Nos. 13 and 23), this case is before the undersigned as the presiding judge for all purposes,

20   including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c). Pending before the Court are

21   petitioner's third amended petition for a writ of habeas corpus (ECF No. 17) and respondent's

22   answer (ECF No. 46).  Petitioner has not filed a traverse.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

# I. BACKGROUND

**A.    Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Defendant Marc Anthony Donias . . . . severely injured his girlfriend, Felicia Huppert, in a violent altercation. He was charged with attempted murder . . . ,[N.1 omitted] assault with a deadly weapon . . . , battery resulting in the infliction of serious bodily injury . . . , infliction of corporal injury on a former cohabitant . . . , and criminal threats . . . . As to all counts, it was alleged that defendant inflicted great bodily injury (GBI) under circumstances involving domestic violence . . . and as to [battery and corporal injury], it was alleged that he used a deadly weapon . . . . Subsequently, a jury found defendant guilty on all counts except making criminal threats and found the allegations true. . . .

ECF No. 45-9, pgs. 1-2; See also ECF No. 46, pg. 13.

### The Prosecution's Case-in-Chief

> Huppert testified that she first met defendant while on vacation in Hawaii in 1989, where she saw him perform in a strip show. The two had sex that night and remained in contact after she returned to Sacramento. Huppert returned to Hawaii and lived with defendant for a month before she began college. Defendant then moved to California to work as a model, and he and Huppert continued to date for approximately one year. Huppert testified that she ended the relationship when she discovered that defendant had given her a venereal disease and was working in the pornography industry.

> Huppert did not see defendant for nearly 20 years, and on July 4, 2008, she decided to look him up on the Internet and found he was working on Broadway in New York. She stay with him at his home in New Hampshire for several days. She testified that defendant decided to move to Sacramento to renew their relationship and attend culinary school. Defendant eventually purchased a condominium, and in May 2009, Huppert moved in with him but continued to keep some of her things at the guest quarters behind her brother's home, where she had been living. She explained that the guest house was accessible through a gated pathway leading to the area behind the main house. Huppert testified that about two weeks after they moved into a condominium together, defendant told her that his friend, Leo Uy, was also relocating to Sacramento and would stay with them for a while until he found employment and his own place to live. She testified that defendant told her

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012).  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

2

that Uy was just a friend, and initially, she did not mind that defendant invited him to live with them. She further testified that she and Uy "got along famously" because they worked in the same industry and had a "connection." However, she testified that there was some tension that she did not understand at first and "a little competitiveness" with Uy. She testified that at some point, Uy told her, "Anthony will never love you like he loves me. You will never make the money that I make." She explained that she thought it was an odd comment but did not realize that defendant was romantically involved with Uy at first. [N.2]

[N.2] Huppert testified that while she did not know that defendant was bisexual, she found out after he gave her a venereal disease that he appeared in gay pornographic movies in 1990. However, she testified that defendant told her that he was heterosexual and only performed sexual acts with other men on film for money. On cross-examination, defense counsel questioned Huppert about an August 29, 2009, email defendant sent her in which he told her he loved her but needed to have sex with other men. Huppert denied receiving the email and said that defendant set up her email account but she did not check it because she did not do anything on computers.

Huppert also testified that about a month after Uy moved in with them, defendant and Uy registered as domestic partners but defendant claimed they did so in order to get Uy on defendant's insurance plan. She testified that on the way home from the notary, she asked additional questions and discovered that defendant and Uy had been in a civil union in New Hampshire for seven years. She was "stunned" upon learning that defendant and Uy were "married." She testified that she and defendant began having problems in their sex life after Uy moved in with them, and defendant purchased a sex swing to try to rekindle their relationship. She testified that she had a sexual encounter with both defendant and Uy on one occasion. She admitted to not being truthful about having a sexual encounter with Uy at the preliminary hearing because her father was present. However, she insisted that she and Uy never touched each other during the encounter and, consequently, she did not consider it a sexual act between herself and Uy.

A few days prior to the alleged assault, she found defendant and Uy engaged in a sexual act. She testified that she was upset and tried to move out right away but defendant would not let her take her personal property with her, so she left it there and moved back into her brother's guest house. The guest house was approximately 250 square feet, with a bedroom and a small bathroom.

She did not see defendant after she moved out until he came to her home on September 5, 2009. She also said she did not talk to him but he called her 99 times on September 5.

Later in her testimony, defense counsel questioned her regarding some September 4, 2009, text messages between defendant and Huppert about using the sex swing together. Huppert testified that she did not recall the text messages and said she was done with defendant at that point and "had no intention of doing anything with him."

///

On September 5, 2009, while Huppert was taking a bath defendant showed up unexpectedly at the guest house. Huppert let him in the house and returned to her bath. She invited defendant into the bathroom with her to talk, and he sat on the toilet seat next to the bathtub. Defendant became agitated and she noticed that defendant's breath smelled of alcohol, describing his level of intoxication as a 10 on a scale from 1 to 10. She added, "he was wasted. He was drunk. He was really drunk." She grew uncomfortable when he accused her of infidelity and became "mean." She testified that defendant asked if she was going out that night or having someone over and she testified that she did not: "I had no plans, no nothing." She then got out of the bathtub and told defendant to go lay down because he was drunk. Huppert called Uy and asked him to come pick defendant up because she was concerned that defendant was too drunk to drive, but Uy refused to come. Defendant began breaking things, and she called Uy again asking for help, which he agreed to do. Huppert asked defendant why he was there, and he replied, "I came over here to kill you like your father said."

Huppert testified that defendant, who was approximately twice Huppert's weight, then grabbed her and threw her into the bathroom. [N.3] She skidded across the toilet to a corner where she became lodged between the toilet and a shelf, knocking off the toilet seat in the process. [N.4] She testified that defendant then followed her into the bathroom and struck her head, including her ears and face "about 60 times." Defendant then raised the ceramic toilet tank lid over his head and slammed it down on her head, which caused her to black out. Huppert testified that before defendant hit her, she held her head down so she would not be hit in the face. The lid shattered and some of the shards cut her leg and breast. She explained that when she awoke, she saw blood everywhere and her adrenaline was high, so she kicked defendant and caused him to fall backward into the bathtub. While defendant was in the bathtub, she pulled herself up and ran towards the door. She struggled with the door because the top lock, which she never used, was locked and she surmised defendant had locked it when he came inside. She was able to exit, and she then ran to a neighbor's house to get help.

[N.3] Huppert said she was five feet one inch and weighed 109 pounds. Defendant was six feet one or two inches and weighed approximately 230 pounds. Defendant testified he is six feet tall and 198 pounds.

[N.4] Huppert testified that her bathroom was very small and that it would be difficult for two people to stand in the bathroom between the toilet and the bathtub.

Huppert's neighbor, Shari Nichelini, testified that on the night of the altercation, she had her front door cracked open so that her cats could come in and out. Suddenly, she heard someone running up her staircase and yelling for help, and she then found Huppert in her home, naked and wet with blood all over her, and observed a "big gash in her head." Huppert was sobbing hysterically and told Nichelini that "her boyfriend hit her over the head with the toilet" and that he was going to kill her. Nichelini called 911 and gave Huppert a towel and a bathrobe.

///

4

Officer John Morris testified that he responded to the 911 call and made contact with Huppert at Nichelini's house. He saw blood covering Huppert's head and neck and a large cut on the top of her head. He also observed that she had a large bruise on her upper back and swelling, discoloration, and abrasions on her face. Officer Morris did not take a formal statement at that time but asked her generally what happened, and Huppert, crying and distraught, told him that defendant attacked her. Officer Morris observed blood drops leading from the guest home where Huppert lived to Nichelini's house. He and other officers searched Huppert's home for defendant but could not find him.

Later, Officer Morris obtained additional details from Huppert. She informed him that she and defendant had broken up three days prior and were not living together. Huppert also told him that the previous night, September 4, she went to defendant's house and during an argument, defendant choked her, but she did not report it. She also said defendant told her that "if he couldn't have me, then no one could." Hubert said defendant "was beating her like she was a man."

Another police officer, Ryan Buchanan, testified that he recovered shattered and bloody pieces of the toilet tank lid in Huppert's bathroom.

Huppert was taken to the emergency room at UC Davis Medical Center. The treating physician, Dr. John Richards, testified that he observed a deep laceration on Huppert's scalp, which required staples, and he observed bruising on Huppert's face, back, hand, and arm. Huppert was also diagnosed with a concussion. Huppert's injuries were consistent with her version of events, including being struck by a ceramic toilet tank lid by a man who raised it above his head before bringing it down onto her head. Dr. Richards, who had been an emergency room physician at UC Davis Medical Center for 19 years and treated head trauma on almost every shift, said that it was not unusual to see patients who had been struck as Huppert described only sustain a laceration and no fracture. However, on cross-examination, after being shown photographs of the bathtub, Dr. Richards testified that the laceration was also "consistent with hitting one's head either on the side [or] the back of the tub or on the wall of the tub or some other object within the tub."

Defendant was also treated for injuries that night. Dr. Anthony Occhipinti treated defendant at Kaiser North hospital. Defendant had a U-shaped laceration on his left hand, lacerations on the front and back of a fractured right-hand finger, bruising on his left forearm with a splinter protruding through the skin, and a laceration on the right side of his forehead. Dr. Occhipinti smelled alcohol on defendant's breath. [N.5] He testified that defendant's hand injuries would be consistent with a ceramic toilet tank lid shattering in his hands. Additionally, he testified that the fractured finger could have been caused by defendant smashing the lid down on Huppert and getting his finger caught between the lid and the toilet tank. However, he also testified that defendant's U-shaped hand laceration injuries would be consistent with being cut with a knife. Additionally, he testified that defendant's injuries would be consistent with using the lid to defend himself and then slipping and falling, with the lid breaking in his hands.

[N.5] There is no evidence of blood-alcohol testing.

1    ECF No. 45-9, pgs. 2-7; <u>see also</u> ECF No. 46, pgs. 13-16.

2                                **Defense Evidence**

3    The defense's theory of the case was that defendant held up the toilet tank
     lid in self-defense, and he and Huppert both fell into the bathtub while she
4    was attacking him, causing the toilet tank lid to shatter and resulting in
     their injuries. Defendant testified on his own behalf.

5
     Defendant testified that he is bisexual and that he was candid about his
6    sexuality with Huppert when they first met in 1989. He explained that
     Huppert later broke up with him when she found out that he performed in
7    gay pornographic films. When he and Huppert reconnected in 2008, he
     had been in a domestic partnership with Uy for six years. He explained
8    that he and Uy had an agreement that he could date other women as long
     as he did not date other men. He testified that when Huppert contacted him
9    in 2008, he was excited to rekindle their relationship. He claimed that
     Huppert knew about Uy, and the three agreed that defendant would move
10   to California to attend culinary school and Uy would eventually join them.

11   Defendant testified that when Uy first moved to California, both men and
     Huppert were on good terms and candidly discussed the boundaries in
12   their relationships. However, as time went on, Uy and Huppert grew
     jealous of one another. He testified that on September 3, 2009, Huppert
13   moved out because she was extremely upset that defendant and Uy used
     the sex swing. She returned to the condominium the following day, and
14   they had another argument.

15   Defendant admitted that on September 5, he called and texted Huppert
     repeatedly throughout the day. He grew concerned when she did not
16   answer. He said she was at work cutting hair when he was calling her
     during the day, but she usually returned his calls. He was concerned about
17   whether she was "okay emotionally" and he was also sorry about breaking
     his promise concerning the sex swing. He said he was not "upset" when he
18   went to see Huppert.

19   During cross-examination, he testified that it was not until that night that
     he thought she might be cheating on him. He testified that if he found out
20   that Huppert was with another man, he would be "[d]isappointed." He said
     "at some point that night that crossed [his] mind." When asked how long it
21   took for that concern to develop, defendant replied, "I don't even really
     think I ever got to the point where is she cheating on me or that, because
22   that's not the arrangement we have. It's not like -- you know, what I did
     during the day was -- so I wouldn't get there to that. [¶] I would -- I would
23   -- I watched the -- the porn tape that we had made, and I watched that
     throughout the day. And -- and that showed me that she doesn't need that
24   male sex from anyone else because our sex was so great. So if anything, I
     was curious about if she was going to be with a woman, who is this
25   woman. She knows [Uy], why can't I know who the woman is." He
     assumed that if Huppert were going to cheat on him, it would be with a
26   woman because that was their "understanding." However, he testified that
     the possibility of Huppert cheating was not his primary concern: "it was
27   always a thought that I had, but it wasn't in the forefront of my mind."

28   ///

                                     6

Defendant further testified that when he arrived at Huppert's home, he observed that both of her cars were there and on that basis, he assumed that she was home. He testified that he was concerned because she had not returned his calls and because she used "a lot of drugs." Defendant testified that after seeing a man wearing a hoodie walking near Huppert's home, he thought she might be having sex with her drug dealer. When asked if that would make him angry, defendant responded, "That would perturb me, but I don't think it would bring me to anger." When asked whether he called Huppert incessantly because he was jealous that she might be with another man, defendant responded, "I could have any woman I want, sir."

He then went to Huppert's home, came inside and sat on the toilet while Huppert returned to her bath and "started out by . . . apologizing" about breaking his promise concerning the swing. When asked whether Huppert's taking a bath confirmed his suspicions that she was cheating, defendant replied that it did not. Defendant testified that instead, he was "relieved" to find that Huppert was alright and that there was no one else there. Huppert's demeanor at that point, according to defendant, was sexy. He then asked, "Why can't we work this out[?]" She asked defendant what it was she could not give him that Uy could. When he explained he loved both of them and pointed out she had previously agreed to the arrangement, Huppert began to get a "little erratic" and slammed her arms down in the tub causing a splash. She said, "fine" and then got out of the tub and left the bathroom. He did not follow her, but heard her on the phone talking to Uy. She then returned to the tub. There was an awkward silence. He told her he was going to urinate and leave. According to defendant, Huppert's demeanor was like that of a spoiled brat, arms folded and moping or pouting.

He testified that he was urinating in the toilet next to the bathtub and was just about to leave when Huppert asked him why he didn't love her the way he loved Uy. He responded, "why don't you get a boob job." Defendant testified that Huppert then became "enraged" and came after him. He testified that he felt a "stinging sensation" on his left hand and saw "a glint or flash of something." He testified he ripped off the toilet seat to use it as a shield, but he dropped it when she pushed him. He testified that he then picked up the toilet tank lid to use it as a shield. He said he pushed Huppert into some shelves and that she came at him a couple of times before he slipped and they both fell into the bathtub, which caused the tank lid to shatter.

Defendant testified that after he and Huppert fell into the bathtub, she screamed, "Get out of my house, you fucker," and he went home. Before he left, he claimed he saw no injuries on Huppert and did not see that she was bleeding. He denied ever telling Huppert that he was going to kill her.

After he arrived home, he realized Uy was not there and that he likely needed medical attention, so he went to the hospital. Defendant claimed that he did not report the incident to the police because he did not want to get Huppert in trouble. At the hospital, he told medical staff, " 'My cheating girlfriend came at me with a shiny object. I don't know what it was.' " When he talked to the police at the hospital, he said he did not mention the toilet tank lid because he wanted to protect Huppert.

7

Defendant claimed that because he consumed whiskey and Vicodin when he returned home before going to the hospital, he was not thinking clearly during the police interview. However, he said he was not intoxicated before he went to Huppert's home and had only consumed one shot of whiskey over the course of two and a half hours before arriving at Huppert's home.

ECF No. 45-9, pgs. 7-11; <u>see also</u> ECF No. 46, pgs. 16-18.

**Prosecution's Rebuttal Case**

Officer Christopher Swift testified that after first responding to the scene at Huppert's home, he later responded to a report of domestic violence at the Kaiser hospital and made contact with defendant. He observed defendant's hand injuries and a scratch above defendant's eye.

Defendant told Officer Swift that he and Huppert had been together for approximately 15 months. Huppert had not responded to his repeated calls earlier that day, so he went to her house because he suspected her of cheating on him. Defendant never said he went to Huppert's house to check on her well-being. Nor did he say he went there to mend their relationship. Defendant said that when he arrived, he sat in his car and saw a man leaving Huppert's house. He suspected this is the man with whom Huppert had been "cheating." Defendant said he felt his suspicion was because Huppert was taking a bath, which was her habit after having sex. Defendant said when he asked Huppert what was going on, she coyly said nothing. She became upset because he questioned her about cheating and told him to leave. He was standing over the toilet after urinating and Huppert was in the bathtub, when Huppert suddenly attacked him. Defendant claimed that she came at him with a blade or something. Defendant claimed that he defended himself but did not remember how he defended himself. Officer Swift described Huppert's injuries and asked defendant if he knew how she sustained them. Defendant said he did not know Huppert had been injured. Defendant never mentioned the toilet tank lid when telling Officer Swift about his defending himself. Officer Swift asked defendant if it was possible he struck Huppert with the toilet tank lid, but did not remember because he blacked out during the altercation. Defendant responded that it was a possibility.

Officer Swift observed that defendant appeared to be "a little bit under the influence," but not to the point he was unable to communicate.

ECF No. 45-9, pgs. 11-12; <u>see also</u> ECF No. 46, pgs. 18-19.

**B.    Procedural History**

Petitioner lays out the procedural history for the case in his third amended petition. <u>See</u> ECF No. 17, pgs. 6-10. On September 26, 2012, petitioner was sentenced to twelve years in prison for crimes including attempted murder and domestic violence. <u>Id.</u> The conviction and sentence were affirmed by the California Court of Appeal on March 4, 2015. <u>Id.</u> On May 13,

1  2015, the California Supreme Court denied review. Id.

2          Petitioner then submitted a petition for writ of habeas corpus to the California

3  Superior Court. The Superior Court denied the petition on June 1, 2016. Id. This denial was

4  upheld by the California Court of Appeal and the California Supreme Court denied review. Id. On

5  August 23, 2016, petitioner submitted a petition for writ of habeas corpus to this Court. See ECF

6  No. 1. Amendments followed and petitioner submitted his current Third Amended Petition to the

7  Court on July 31, 2017. See ECF No. 17. After multiple motions to extend and reassignment of

8  the case, respondent submitted their Answer to petitioner's petition on July 8, 2019. Petitioner

9  filed no traverse. The Court shall now review the petition on the merits.

10

11                          **II.  STANDARDS OF REVIEW**

12          Because this action was filed after April 26, 1996, the provisions of the

13  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

14  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128

15  F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not,

16  however, apply in all circumstances.  When it is clear that a state court has not reached the merits

17  of a petitioner's claim, because it was not raised in state court or because the court denied it on

18  procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must

19  review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the

20  AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim

21  under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002)

22  (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA

23  did not apply because evidence of the perjury was adduced only at the evidentiary hearing in

24  federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where

25  state court had issued a ruling on the merits of a related claim, but not the claim alleged by

26  petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and

27  federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

28  ///

9

1         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

2 not available for any claim decided on the merits in state court proceedings unless the state court's

3 adjudication of the claim:

4
5       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6
7       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8 Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

9 "contrary to" or represents an "unreasonable application of" clearly established law. Under both

10 standards, "clearly established law" means those holdings of the United States Supreme Court as

11 of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006)

12 (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the

13 holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc).

14 Supreme Court precedent is not clearly established law, and therefore federal habeas relief is

15 unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54

16 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal

17 law to be clearly established, the Supreme Court must provide a "categorical answer" to the

18 question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state

19 court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

20 contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

21 created by state conduct at trial because the Court had never applied the test to spectators'

22 conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's

23 holdings. See Carey, 549 U.S. at 74.

24         In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

25 majority of the Court), the United States Supreme Court explained these different standards. A

26 state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

27 the Supreme Court on the same question of law, or if the state court decides the case differently

28 than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state

1    court decision is also "contrary to" established law if it applies a rule which contradicts the

2    governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

3    that Supreme Court precedent requires a contrary outcome because the state court applied the

4    wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court

5    cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at

6    406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine

7    first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6

8    (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

9    habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the

10   error had a substantial and injurious effect on the verdict, or was harmless.  See id.

11           State court decisions are reviewed under the far more deferential "unreasonable

12   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

13   unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

14   510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

15   that federal habeas relief may be available under this standard where the state court either

16   unreasonably extends a legal principle to a new context where it should not apply, or

17   unreasonably refuses to extend that principle to a new context where it should apply.  See

18   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

19   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

20   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

21   75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even

22   where the federal habeas court concludes that the state court decision is clearly erroneous.  See

23   Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

24   deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

25   As with state court decisions which are "contrary to" established federal law, where a state court

26   decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

27   unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

28   ///

1    The "unreasonable application of" standard also applies where the state court

2    denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

3    848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

4    are considered adjudications on the merits and are, therefore, entitled to deference under the

5    AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

6    The federal habeas court assumes that state court applied the correct law and analyzes whether the

7    state court's summary denial was based on an objectively unreasonable application of that law.

8    See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

9

10                                **III.  DISCUSSION**

11    Petitioner argues that his sentence should be vacated, or that a new evidentiary

12    hearing should be conducted, on the following grounds: 1) Ms. Huppert, the victim in petitioner's

13    attempted murder trial, recently recanted her testimony in the form of a video recording; 2) two

14    jurors at petitioner's trial spoke with a witness for the prosecution, thus depriving petitioner of a

15    fair trial; 3) petitioner's defense counsel at trial was ineffective; 4) petitioner's appellate counsel

16    was ineffective; and 5) general legal precedent warrants granting this petition. For the reasons

17    discussed below, the Court finds petitioner's arguments unconvincing and recommends that his

18    petition be denied.

19        **A.        Actual Innocence Based on Newly Discovered Evidence**

20    Petitioner argues that he is entitled to a writ of habeas corpus through a claim of

21    "actual innocence." The Court disagrees.

22    Prisoners asserting innocence must establish that, in light of new evidence, it is

23    more likely than not that no reasonable juror would have found the petitioner guilty beyond a

24    reasonable doubt.  House v. Bell, 547 U.S. 518, 536-37 (2006). This formulation ensures that the

25    petitioner's case is truly extraordinary, while still providing the petitioner a meaningful avenue by

26    which to avoid a manifest injustice. Id. (internal citations omitted) "In the usual case the

27    presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted

28    claims." Id. Yet a petition supported by a convincing gateway showing raises sufficient doubt

                                        12

1    about the petitioner's guilt to undermine confidence in the result of the trial without the assurance

2    that that trial was untainted by constitutional error; hence, a review of the merits of the

3    constitutional claims is justified.  <u>Id</u>.

4              Petitioner argues that his conviction should be vacated as a result of newly

5    discovered evidence that "points toward petitioner's innocence." ECF No. 17, pg. 23.

6    Specifically, petitioner is referring to a video-recorded statement made by his former girlfriend,

7    Ms. Huppert, who was the victim of petitioner's sentenced crimes and a key witness at the

8    associated trial. Petitioner states that:

9              In this case, new evidence has surfaced that directly shows
10             PETITIONER'S innocence to the crime of attempted murder. Specifically,
               Ms. Huppert herself agreed to be interviewed on camera. [. . .]

11                         *  *  *

12             In the interview, she has admitted that she first attacked the PETITIONER
               with a knife and that she intentionally set out to frame him by staging her
13             apartment to make it look as though he attacked her. In fact, as she
               admitted, she "planned this whole thing out" by "trashing" her apartment
14             before he even came over. She further admitted to lying during
               PETITIONER'S Trial when she testified that PETITIONER attacked her
15             with a ceramic toilet-lid. In fact, she confessed that PETITIONER
               "grabbed the toilet thing cover to defend himself because I'm going at him
16             with the knife. And, when I hit him with the knife, the, the, the toilet thing
               cover when I hit it, it fell and it hit my head. And that's how that
17             happened[.]" (See EXHIBIT '<u>N</u>' for text of video).

18             This recantation unerringly points towards PETITIONER'S innocence.
               The prosecution's case was built almost exclusively on the testimony of
19             Ms. Huppert herself and on her account of the incident as relayed to the
               police afterwards. The "only" evidence corroborating her version of events
20             was her injuries which included bruising above her right eye; a four-
               centimeter laceration on the right side of her scalp <u>towards the back of her</u>
21             <u>head</u>; a concussion; contusions to her back, right hand, right wrist, and left
               arm; and cuts on her leg and breast from the broken toilet-lid. (1RT 107,
22             110, 203-206). According to the prosecution, her injuries were consistent
               with someone having a toilet-lid being brought down on her head and with
23             slipping and <u>hitting one's head on the side of the tub or wall</u>. (1RT 210-
               11). [. . .]

24                         *  *  *

25
26             Now, she has come forward and admits that her accusations against
               PETITIONER were all a lie. [. . .]

27                         *  *  *

28   ///

                                        13

1

2

3

4

5

      Given that the prosecution's case rested almost entirely on the largely uncorroborated accusations and trial testimony of Ms. <u>Huppert's new admissions as to the falsity of her entire set of accusations qualify as new-evidence</u> that show that <u>PETITIONER is innocent of at least the attempted murder charge and</u>/<u>or the enhancements,</u> if not the entire conviction and illegal sentence.

      ECF No. 17, pgs. 89-92.

6

7

8

9

      Respondent argues that the state court's original determination was correct in that, regardless of this "new evidence," petitioner does not show a proper basis for the writ. The Superior Court addressed this claim in a decision undisturbed by the Court of Appeal or California Supreme Court. Respondent highlights the state court's ruling as follows:

10

11

12

13

14

15

16

17

18

      At this point, the videos are hearsay. "A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted ... This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. …It may be supplied by other witness testimony, circumstantial evidence, content and location." (<u>People v. Goldsmith</u> (2014) 59 Cal. 4th 258, 267-268, citations omitted.) The only declaration comes from an investigator who met with the man who took the videos. According to the investigator's declaration, the man said that he was a customer in the victim's barber shop and that she told him she wanted to confess that she had not testified truthfully. There is no declaration from the man who recorded the videos as to the circumstances under which they were taken, and the declaration from the investigator fails to reveal any significant details about the taking of the videos. Petitioner also has failed to provide a declaration or an affidavit from the victim. The videos record unsworn statements and could not be the basis of a perjury charge.

19

      Even if petitioner could present actual evidence from the victim, however, her current account does not undermine the verdict.

20

            * * *

21

22

23

24

25

26

      Petitioner contends that there was no evidence at trial to contradict her new statement that she called him over. The People had cited phone records and petitioner's own testimony. At trial petitioner testified that he had repeatedly called the victim during the day leading up to the attack. Asked if she responded to his calls, petitioner testified that she had not. Petitioner then was asked: "At some point did you decide to go to her home?" He responded: "Yes, I did." Petitioner was asked why, and he testified that he wanted to talk to the victim. If the victim had called him to come over so that she could set her plans in motion, petitioner would have testified that she called him over, not that he decided to go over or that he had a reason for doing so other than being called over.

27

28

      This statement was not merely collateral to the recantation. Petitioner's argument is that the victim has now confessed that she was the aggressor. The idea that she planned the attack, readied her apartment and called

14

petitioner to come over is the starting point for that theory. Evidence presented at trial, including petitioner's own testimony, contradicts the new statements and indicates that the videos either were never intended to be taken seriously or show that the victim is now reacting as many other victims of domestic violence have by changing her account. Even if the victim testified in conformity with the videos, her testimony would be unpersuasive in light of the evidence at trial. Petitioner has not met his burden for going forward.

ECF No. 45-11, pgs. 2-4; <u>see also</u> ECF No. 46, pgs. 24-25.

Also, according to respondent, petitioner's "innocence" right is extremely nebulous and, under the applicable legal standards, fails. According to respondent:

It was reasonable for the Superior Court to find no showing that every reasonably [sic] factfinder would forget that sworn trial testimony from Petitioner himself[N.4] admitted that he independently chose to go to victim Huppert's residence. Thus, even if hypothetically a person has a right to freedom, despite being lawfully convicted, based upon a theory that new evidence shows he is innocent, there is no basis for the writ. First, it is unreviewable under state law that Petitioner's state-court presentation lacked admissible evidence. Independently, it was reasonable to find the evidence, even were it admissible, was not the sort that all reasonable jurors would "choose to believe," so to even meet the <u>Schlup</u> standard. <u>See Smith v. Baldwin</u>, 510 F.3d at 1142 n.11. A fortiori, it was reasonable to find that such evidence would not meet the more-demanding standard for a freestanding innocence claim. <u>House</u>, 547 U.S. at 554.

ECF No. 46, pg. 26.

Petitioner responds to the Superior Court's determination by stating that:

The <u>Superior Court</u>, in denying PETITIONER'S habeas corpus petition, myopically focused on what it characterized as "the most telling of the contradictions," namely the fact that Ms. Huppert, in the video stated that she called PETITIONER over to her house even though PETITIONER'S Trial testimony suggested that she never called him. <u>The Superior Court's focus on this fact was clearly-misplaced</u>. It may be true that PETITIONER did not affirmatively testify that Ms. Huppert called him. But, he did not affirmatively testify that she did not call him either.

Moreover, even to the extent Ms. Huppert's statements on the video about calling PETITIONER over, <u>she could've been pointing to the fact that</u> she knew if she didn't answer his calls, <u>he would eventually come over</u>, as he had done so many times before. Eventhough [sic], Ms. Huppert's new statements in the video were inconsistent with the evidence introduced at trial, this does not make her recantation untrue. She could have broken the "BONG" and as usual was just generalizing. <u>There are arguably "collateral-details"</u> that do not take away from the main thrust of her claim on the video, which is, she was the aggressor and the PETITIONER was merely acting in a self-defense mode and that <u>she lied when she stated earlier that PETITIONER smashed her over the head with the toilet-lid cover.</u>

1    ECF 17, pgs. 92-93.

2         The Court finds petitioner's argument unconvincing. As respondent and the

3    Superior Court point out, there are reasons to discount this new "evidence" as incredible,

4    including: 1) the acknowledged suspicion of reviewing the recantations of statements made by a

5    victim of domestic violence; and 2) the significant inconsistencies between this "new" video

6    evidence and the admitted evidence presented at trial. See ECF No. 46, pgs. 24-25. As described

7    by respondent, the jury at petitioner's trial had access to evidence which counters petitioner's

8    claim that Ms. Huppert was the aggressor, including phone records and petitioner's own

9    testimony at trial as to how he arrived at Huppert's house the night of the incident. From this, it

10   was proper for the Superior Court to find that it was not more likely than not that a rational

11   factfinder would have had a reasonable doubt about petitioner's guilt.

12        To the point that petitioner disagrees, it has been established that "[w]ith regard to

13   a habeas claim of actual innocence, the standard is demanding and permits review only in the

14   extraordinary case." House, 547 U.S. at 521. Here, petitioner seems to argue that because he did

15   not "affirmatively testify that [Ms. Huppert] did not call him" to her house, that petitioner's

16   testimony at trial does not cut against the allegations made in the video suggesting Huppert

17   planned the confrontation. However, "[w]hen confronted with a challenge based on trial evidence,

18   courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence

19   supports the verdict." Id. at 526. Even removing issues of the video's admissibility[2], it is clear

20   that the jury's verdict was supported by significant evidence, namely in the form of petitioner's

21   testimony. Ultimately, the burden of satisfying the demanding standard of actual innocence rests

22   on the petitioner. Id. at 538. It is clear that petitioner has failed to satisfy that burden here.

23   Therefore, the state court's determination was neither contrary to, nor based on, an unreasonable

24   application of controlling precedent.

25   ///

26   _____

27        [2]    In analyzing an actual-innocence claim, the court must consider "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would

28   necessarily be admitted under 'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538. (Quoting Schlup v. Delo, 513 U.S. 298, 327 (1995))

16

**B.** **Juror Misconduct**

Petitioner argues that jurors at his trial spoke with a witness for the prosecution, thus demonstrating juror-bias and warranting granting of writ. The Court disagrees.

At issue is a discussion had between a juror, an alternate juror for petitioner's trial, and a police officer that was called as a prosecution witness. The California Court of Appeal summarized the interaction as follows:

> Later in the trial, Juror Number 6 informed the court that she had a conversation with one of the witnesses, Officer Swift, in the courthouse hallway. Officer Swift had already testified for the prosecution and would later testify during the prosecution's rebuttal case. The court examined the juror outside the presence of the rest of the jury. The juror explained that she did not recognize Officer Swift.[N.6] There were a lot of police officers in the hallway. She said, "We were talking computers and my parents up in the hills and how hard it is for -- to get along without me being there. And he interjected about . . . a computer program that I can buy that I can actually access their computer. And he was telling me that, about the computer program." Officer Swift was dressed in his uniform. She explained that their conversation lasted approximately two to three minutes. She further explained that Officer Swift did not identify himself as a witness and they did not discuss any aspects of the case. The court asked her whether the conversation affected her impartiality, and she said that it would not.

> [N.7] The court similarly questioned an alternate juror who participated in the hallway discussion but did not participate in deliberations. Defendant concedes that because the alternate did not participate in the deliberations, "his participation in the conversation is not relevant to this issue."

> ECF No. 45-9, pgs. 12-13.

Petitioner argues that it was an error to not hold a more "adequate and complete hearing" to ensure that the jurors were not biased and capable of making an informed decision. See ECF No. 17, pg. 96. Specifically, petitioner states that:

> In this case, the trial court violated [petitioner's] federal constitutional rights when it refused to excuse Juror#6 after learning that she had an inappropriate conversation with one of the witnesses. That witness is Officer (Christopher Swift). Swift previously had testified on behalf of the prosecution. (2RT 322). He also was scheduled to testify again (and did) as a prosecution rebuttal witness following the close of the defense case.

> * * *

> [. . .] Even though they claim they did not discuss the case at all, it is quite clear that due to the nature of this case with security and safety, that this conversation did bias one if not both of the jurors [. . .]

17

* * *

[. . .] Juror #6 insisted that her contact with him would not effect [sic] her verdict or her ability to be fair and impartial. (2RT 488). (Come on, Really! How can this be a sufficient inquire [sic] as to whether or not she can remain unbiased by the conversation, when she didn't even pay enough attention to the fact that he was a witness in this case from the get go [. . .].

* * *

[. . .] Since Juror #6 blatantly violated the court's instruction to talk to a witness, she committed misconduct.

ECF No. 17, pgs. 96-101.

Respondent argues that the Court of Appeal was correct in finding that, though "Juror Number 6 committed misconduct by speaking with a witness . . ., [t]his particular conversation did not produce prejudice because it was very brief, added nothing to the evidence at trial, and did not relate in any way to the issues at trial." ECF No. 46, pg. 29. Specifically, respondent states that:

Commonly, the most salient evidence on that question [of bias] is the juror's own representation as to whether the juror can be impartial, despite whatever has previously occurred. Smith v. Phillips, 455 U.S. at 217 (quoting Dennis v. United States, 339 U.S. 162, 171 (1950) and citing United States v. Reid, 12 How. 361, 366 (1852)). That presents a factual question that differs little, if at all, from the inquiry before commencement of trial. See Mu'Min v. Virginia, 500 U.S. 415, 425 (1991) (the trial judge's ultimate "decision" is this: "is this juror to be believed when he says he has not formed an opinion about the case?"); Patton v. Yount, 467 U.S. 1025, 1036 (1984) (issue "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed").

Here, there was that most salient evidence.  The juror in question recounted what happened; she said the contact would not affect her verdict; the trial judge factually credited the juror's assessment of representation; and the appellate Opinion left that factual assessment undisturbed. (Opinion at 12-14, 17, 18.) That trial counsel plainly was [sic]  That Petitioner's dislikes the trial judge's credibility call is no cause for finding unreasonableness in the state court rejection of Petitioner's attempts to invalidate the verdict on the ground of the contact with the juror.

ECF No. 46, pgs. 30-31

///

///

18

1    The Court agrees with respondent.  First, it appears undisputed that there was a

2    conversation engaged in by an alternate juror and a witness. That alternate juror's specific

3    conversation with the witness did not unduly prejudice petitioner at trial. As noted by the state

4    court, defense counsel at trial "concede[d] that because the alternate did not participate in the

5    deliberations, 'his participation in the conversation is not relevant to this issue.'" ECF No. 45-9,

6    fn. 7. Petitioner does not argue against this concession and, besides attributing his right to a

7    mistrial to the "two (2) juror['s] failure to follow [instructions]", petitioner's arguments focus

8    entirely on the misconduct of Juror #6. See ECF No. 17, pg. 106. Therefore, the Court turns to the

9    conduct of Juror #6.

10    Petitioner notes that Juror #6 committed misconduct by speaking with one of the

11    prosecution's witnesses, but that fact is not in dispute. The trial court and subsequent Appellate

12    Court acknowledged that it was improper for a juror to speak with a witness during trial. See ECF

13    No. 45-9, pg. 17. As petitioner notes, witness communication with a sitting juror may raise a

14    rebuttable presumption of prejudice, and indeed, such a presumption was acknowledged by the

15    Superior Court. People v. Merriman, 60 Cal. 4th 1, 95 (2014). However, it was ultimately decided

16    that the presumption was in fact rebutted in petitioner's case. See ECF No. 45-9, pg. 17. Thus, at

17    issue is whether the decision to proceed with Juror #6 was either unreasonable given the facts or

18    contrary to established federal law. Here, petitioner presents no convincing argument for either

19    prong.

20    Petitioner notes that the Supreme Court in Smith v. Phillips, 455 U.S. 209 (1982)

21    "has long held that the remedy for allegations of Juror partiality is adequate-hearing, [in] which

22    the defendant/[petitioner] has the opportunity to prove actual bias. [. . .]" ECF No. 17, pgs. 105-

23    106. To this point, it is evident from the record that the trial court did in fact conduct a hearing in

24    which defense counsel was permitted to provide argument. The Appellate Court stated that:

25    [. . .] The trial court appropriately questioned the juror about her ability to
remain impartial, and she assured the court that she could continue to be

26    fair and impartial. Additionally, we note that the trial court asked defense
counsel for his thoughts, and counsel stated that, although he was

27    "concerned," he thought the court "got the assurances from the [jurors]
that they could remain fair," a detail defendant omitted from his appellate

28    briefing. Significantly, defense counsel, who along with the trial court,

1
2
observed Juror Number 6's demeanor during the misconduct hearing and her assurance that her impartiality had not been tainted, did not request the juror's exclusion or a mistrial.

3
ECF No. 45-9, pg. 17

4
To the point of unreasonableness, petitioner argues that: (1) the jurors failed to

5
heed the court's instructions to avoid talking with witnesses; (2) defense counsel failed to make

6
"meaningful objections to the court's refusal to call a mistrial . . ."; and (3) the court did not hold

7
an "Adequate-Hearing." See id. As discussed above, the trial court acknowledged a rebuttable

8
presumption of prejudice stemming from the juror/witness conversation, held an adequate hearing

9
on the issue, and ultimately found that presumption adequately rebutted.

10
To the extent that petitioner argues ineffective defense counsel at his trial warrants

11
the granting of his petition, it is well established that ". . .[e]ven if many reasonable lawyers

12
would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness

13
grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."

14
Rogers v. Zant, 13 F.3d 384, 386. As is clear from the record, petitioner's own counsel agreed

15
with the trial court's determination that Juror #6 could "remain fair" and elected to proceed with

16
trial. Petitioner presents no convincing argument or authority which would paint defense

17
counsel's judgment on this issue as unreasonable.

18
Therefore, this interaction between jurors and a prosecution witness at petitioner's

19
trial, though improper, is not here a basis upon which to grant writ.  The state court's decision in

20
this regard was neither contrary to nor based on an unreasonable application of controlling federal

21
law regarding juror misconduct claims.

22
**C.      Ineffective Assistance of Trial Counsel**

23
Petitioner argues that, for a number of reasons, his defense counsel at trial failed to

24
provide adequate representation such that his petition for writ should be granted. Respondent

25
disagrees and argues that petitioner cannot demonstrate sufficient error on the part of defense

26
counsel to justify granting the writ. The Court agrees with respondent.

27
The Sixth Amendment guarantees the effective assistance of counsel.  The United

28
States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

1    Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all

2    the circumstances, counsel's performance fell below an objective standard of reasonableness.  See

3    id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have

4    been the result of reasonable professional judgment.  See id. at 690.  The federal court must then

5    determine whether, in light of all the circumstances, the identified acts or omissions were outside

6    the wide range of professional competent assistance.  See id.   In making this determination,

7    however, there is a strong presumption "that counsel's conduct was within the wide range of

8    reasonable assistance, and that he exercised acceptable professional judgment in all significant

9    decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S.

10   at 689).

11          Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

12   at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

13   unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A

14   reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.;

15   see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

16   determine whether counsel's performance was deficient before examining the prejudice suffered

17   by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

18   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

19   followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

20   697).

21          In light of the standard outlined above, the Court will address each of petitioner's

22   claimed instances of ineffective assistance of trial counsel.

23                  1.      Electing Self-Defense Theory

24          Petitioner argues that it was unreasonable for the trial court to find it proper for

25   petitioner's defense counsel to elect to pursue a theory of self-defense as opposed to arguing for a

26   lesser offense such as manslaughter. Petitioner claims that it would have been more prudent to

27   highlight that the physical altercation between him and Ms. Huppert was not deliberate or

28   premeditated and, as such, would constitute manslaughter. According to petitioner, a simple

21

1    investigation would have informed counsel that "[petitioner] has no history of violence" and ". . .

2    about [petitioner's] prescribed medication's side-effect's [sic], especially when combined with

3    alcohol[.]" ECF No. 17, pg. 116.  Petitioner states that:

> Self Defense was completely the [wrong], illogical strategy, based on the
> prosecution['s] case. Eventhough [sic], Ms. Huppert was caught in 18
> [perjurious] statements on the stand, the jury did not buy such a non
> sensical [self-defense] theory.
>
> The "only" clear path to understanding why defense counsel jumped to
> this conclusion is because he lacked adequate investigation.
>
> All he had to prove was that even if PETITIONER defended aggressively
> due to provocation during the domestic violence (mutual combat), it was
> impulsive, without careful consideration of the choice and its
> consequences. Now, the New Evidence of prescription drugs proves
> limited culpability. Then the jury could have seen that it was not deliberate
> and/or premeditated.
>
> ECF No. 17, pgs. 116-17.

13        Respondent argues that petitioner is mistaken in assuming that: (1) his present

14   custody is based on a jury finding of premeditation and deliberation; (2) impulsivity is a defense

15   to murder in California; (3) his election to become intoxicated could help him show provocation;

16   and (4) that his trial counsel's decision to pursue a theory of self-defense as opposed to mutual

17   combat could not be considered reasonable.

18        The Court agrees with respondent. First, as respondent notes, "[h]ad it been

19   charged and found true that Petitioner's murder attempt included premeditation and deliberation,

20   his sentence for attempted murder would be an indeterminate term of life, without parole

21   eligibility for at least seven years." ECF No. 46, pg. 36. Under California Penal Code § 664(a) "if

22   the crime attempted is willful, deliberate, and premeditated murder . . . the person guilty of that

23   attempt shall be punished by imprisonment in the state prison for life with the possibility of

24   parole." Petitioner was sentenced to a term of twelve years imprisonment. See ECF 45-2, pg. 221.

25   Therefore, dispelling allegations of premeditation and deliberation were not relevant at

26   petitioner's trial.

27   / / /

28   / / /

1         Second, as respondent notes, "[i]mpulsivity may be a way to avoid a jury finding

2  that there was the careful consideration needed for premeditation and deliberation (which, again,

3  was not charged). But it would be reasonable for a state court to expect that a rational defense

4  attorney would not be under the erroneous impression that impulsivity in an intent to kill is

5  somehow inconsistent with murder itself." ECF No. 46, pg. 36. At trial, defense counsel

6  presented a theory of self-defense. Again, given that premeditation and deliberation were not at

7  issue, it is unclear how a failure to argue impulsivity demonstrates that petitioner's counsel acted

8  inadequately.

9         Third, to the extent petitioner argues that his voluntary use of alcohol and pain

10  killers supports his argument of a provoked attempted killing, it is clearly established in

11  California that "the test [of] whether provocation is adequate is whether 'an average, sober person

12  would be so inflamed that he or she would lose reason and judgment,' " and "voluntary

13  intoxication [cannot] 'negate express malice so as to reduce a murder to voluntary

14  manslaughter.'" <u>People v. Rangel</u>, 62 Cal. 4th 1192, 1226 (2016). Given this principle, it was

15  reasonable for petitioner's defense counsel to avoid the futile argument that petitioner's

16  involuntary intoxication should have been considered a mitigating circumstance to his attempted

17  murder charge.

18         Fourth, to the extent that petitioner argues his counsel was ineffective by failing to

19  argue "mutual combat" as a defense, the Court disagrees. In California, mutual combat requires ".

20  . . evidence from which the jury could reasonably find that both combatants actually consented or

21  intended to fight before the claimed occasion for self-defense arose." <u>People v. Ross</u>, 155 Cal.

22  App. 4th 1033, 1046-47 (2007). Given that petitioner informed his trial counsel that "[Huppert]

23  attacked me and I defended myself", it appears reasonable for his counsel to elect a theory of self-

24  defense over mutual combat.

25         In challenging the effectiveness of counsel, petitioner must overcome the "strong

26  presumption" that his counsel pursued a reasonable strategy. <u>Strickland</u>, 466 U.S. at 687. Despite

27  claiming that an investigation into petitioner's intoxicated state on the night of the incident should

28  have led counsel to pursue a theory of "mutual combat", petitioner offers no convincing argument

1   that his counsel's assistance fell below an "objective standard of reasonableness." Id. Since it is

2   petitioner's burden to overcome this presumption, and he has failed to do so, his counsel's

3   decision to pursue a theory of self-defense cannot serve as the basis of granting this writ.  This

4   Court finds that the state court's denial of this was neither contrary to nor based on an

5   unreasonable application of Strickland.

6                  2.      Failure to Request Lesser Offenses Instructions

7           Petitioner argues that his trial counsel erred in failing to request jury instructions

8   on lesser-included or related offenses to his criminal charges at trial. According to petitioner:

9           [Petitioner] faced the same substantial risk, that the jury likely harbored
            doubt about the requisite of specific intent, but it believed that
10          PETITIONER is guilty of some offense. Indeed, the jurors doubt about
            PETITIONER's intent had no-alternative option, so they chose intention
11          to murder. The absence of a lesser included or related offense and/or
            instruction on mutual combat, aggressive assault or involuntary
12          intoxication undermined confidence in the [jury's] outcome of the trial and
            entitled the PETITIONER a New Trial or at a minimum, an evidentiary
13          hearing.

14          ECF No. 17, pg. 121.

15          Petitioner's assertion that "[c]ounsel could have no tactical justification for (not

16  investigating and) not requesting the instruction" is simply incorrect. First, many of petitioner's

17  suggested lesser offenses would have been inapplicable at trial. See ECF 45-9, pgs. 20-21

18  (California Court of Appeal deeming heat of passion provocation inapplicable); see also section

19  (III)(C)(1) above for discussion on inapplicability of voluntary intoxication and mutual combat.

20  Second, petitioner's defense counsel was free to avoid jury instructions that ran counter to their

21  legal strategy. The Ninth Circuit has held that "[d]efense counsel has leeway to make strategic

22  decisions at trial and 'need not request instructions inconsistent with its trial theory.'" Smith v.

23  Stewart, 77 F. App'x 925, 926 (9th Cir. 2003) (citing Butcher v. Marquez, 758 F.2d 373, 377 (9th

24  Cir. 1985)). As discussed above, defense counsel's decision to pursue a theory of self-defense

25  appears to be objectively reasonable. As such, it was also reasonable to avoid instructing the jury

26  on lesser offenses which would have cut against counsel's theory of self-defense. Insofar as

27  petitioner disagrees, he provides no Supreme Court case which convincingly argues to the

28  contrary. Therefore, his counsel's decision to not request instructions on lesser related offenses

                                              24

1    does not warrant granting writ. The state court's denial of this claim was neither contrary to nor

2    based on an unreasonable application of <u>Strickland</u>.

3                    3.        <u>Failure to Present Expert on Injury</u>

4            Petitioner argues that the trial court erred in not granting his motion for a new trial

5    on the ground that this trial defense attorney failed to introduce medical testimony. Specifically,

6    petitioner argues that Dr. Bennet Omalu, who reviewed petitioner's case, should have testified at

7    trial. Petitioner states that:

8            First, trial counsel was ineffective in failing to investigate and introduce
             medical expert [opinion] testimony that would have directly contradicted
9            Ms. Huppert's claims as to how appellant allegedly attacked her. Dr.
             Bennet Omalu reviewed the case file and concluded that Ms. Huppert's
10           injuries were inconsistent with her testimony that appellant struck her in
             the face over 60 times. In fact, he stated that it is not "medically feasible"
11           that she would be hit in the head and face this many times and sustain
             "only" the limited abrasions, contusions and lacerations to her head and
12           face and that she did. (2RT 363). Dr. Omalu further stated that he would
             have testified that the absence of skull-fractures and other trauma to her
13           scalp "belied" her claim that appellant raised the toilet seat/lid-cover over
             his head and slammed it violently on top of her. (2RT 363) Had appellant
14           done that, one would have expected to see satellite abrasions, micro-
             lacerations, dice-abrasions, and contusions of the shattered pieces of the
15           implement in addition to a nidus-impact abrasions-contusion. In Dr.
             Omalu's view, this pattern of trauma was completely absent in this
16           instance making it less likely that this type of injury sustenance or
             generation occurred between appellant and Ms. Huppert. (2CT 363).
17
                                            *  *  *
18
             Omalu's testimony on these points would have benefit appellant's case in
19           a couple of different ways. First, it would have cast doubt on Ms.
             Huppert's credibility, which was the central issue in the case. [. . .]
20           Second, it would have refuted the prosecution's own expert – Dr. John
             Richards, who expressed the opinion that Ms. Huppert's injuries were
21           consistent with someone being hit over the head with a toilet-lid and that it
             is not unusual for a person to be hit with such an object and suffer nothing
22           more than a laceration. (RT 547). [. . .]

23           ECF No. 17, pgs. 130-131.

24           As the Appellate Court laid out in its denial of petitioner's petition, and respondent

25    reiterates in their answer, there were multiple reasons for the petitioner's defense counsel to deem

26    it unnecessary to provide its own medical expert testimony. The Appellate Court stated:

27    / / /

28    / / /

1
2

As for Huppert's testimony she had been struck more than 60 times in the head, an expert opinion is not necessary to establish that her injuries were inconsistent with that claim. The jury likely discounted this testimony.

3

\* \* \*

4
5
6
7
8
9
10
11
12

In any event, we agree with the trial court that, consistent with counsel's declaration, it was a reasonable tactical decision within the "wide range of reasonable professional assistance" to not present medical expert testimony and focus on Huppert's injuries. Counsel explained: "[T]his decision was based on [defendant's] statements to me that in using the toilet lid as a shield to defend himself from [] Huppert's attack, he *did* hit (but not smash) her in the head with the toilet lid. [N.14] However, as he explained, her injuries and bleeding occurred from her falling and hitting her head on the tub. [¶] . . . [¶] [Defendant's] statement to me concerning hitting [] Huppert in the head was consistent with his statement contained in the police report wherein he admitted that it was possible that he struck [] Huppert over the head with the toilet tank lid and just did not remember doing so because he blacked out." This strikes us as the quintessential reasonable tactical decision. Trial counsel cannot reasonably be expected to present expert testimony that is inconsistent with his client's statements in both the police report and in a subsequent client interview.

13

\* \* \*

14
15
16
17

Further, trial counsel elicited equivocal testimony from both Dr. Richards and Dr. Occhipinti about the cause of Huppert's and defendant's injuries. Both testified on cross-examination that Huppert and defendant's respective injuries were consistent with defendant's story. Neither doctor could say definitively which version of events was more consistent with the injuries. After his thorough cross-examination eliciting favorable testimony, trial counsel may have reasonably decided that it was unnecessary to rebut the prosecution's medical expert testimony.

18

ECF No. 45-9, pg. 32-34.

19
20
21
22
23
24
25
26
27
28

As to petitioner's argument about Ms. Huppert's credibility, it is clear that her statement regarding being struck in the head over 60 times was plainly doubtful and expert testimony to refute this was unnecessary. Additionally, Ms. Huppert was subject to cross-examination and defense counsel had ample opportunity to put her credibility into question. Petitioner's claim that Dr. Omalu's testimony would have contradicted the prosecution's expert testimony was also adequately addressed. "Neither doctor could say definitively which version of events was more consistent with the injuries" and defense counsel could have reasonably concluded their testimony was sufficiently rebutted through cross-examination. ECF No. 45-9, pgs. 33-34. Ultimately, petitioner provides no convincing argument to rebut the Appellate Court's determination that defense counsel's decision to not provide their own expert witness was

26

1   reasonable. Given the strong deference afforded to counsel strategy at trial, this Court agrees that

2   having Dr. Omalu take the stand was not necessary for the provision of effective legal

3   representation.  The state court's denial of this claim was neither contrary to nor based on an

4   unreasonable application of <u>Strickland</u>.

5                        4.      <u>Failure to Present Impeachment Witness</u>

6                Petitioner also argues that defense counsel was ineffective in failing to call Leo Uy

7   as an impeachment witness against Ms. Huppert. According to petitioner, "Leo Uy was a key

8   person in the scenario underlying the incident. He was the owner of the condominium in which

9   appellant and Ms. Huppert lived. Leo and [petitioner] were also lovers, a key fact that

10  complicated [petitioner's] relationship with Ms. Huppert." ECF No. 17, pgs. 137-138. Petitioner

11  claims that Uy's testimony would have showed that Huppert lied about their three-way

12  relationship, lied about her own history with drug-use, and would have demonstrated that Huppert

13  had a "propensity to violence and aggressiveness." ECF No. 17, pgs. <u>Id.</u> at 138-141.

14               Respondent reiterates the Appellate Court's determination of defense counsel's

15  decision to not call Uy as a witness:

16          We also agree with the trial court that defendant's counsel had good
            tactical reasons for not calling Uy as an impeachment witness. As trial
17          counsel stated in his declaration, Uy would have been impeached with the
            testimony he gave at the preliminary hearing and may have hurt
18          defendant's case with testimony about defendant's past violent behavior.
            Indeed, during the preliminary hearing, Uy testified that Huppert was
19          never violent with defendant. Counsel specifically declared that before
            presenting the defense's case-in-chief, he and defendant discussed the "
20          'pros and cons.' " of calling Uy as a witness and decided that Uy's
            impeachment value was minimal where Huppert had already been
21          significantly impeached and Uy's honest testimony would potentially
            damage defendant's case. And we note that Uy would have been viewed
22          as having a bias related to his relationship with defendant and his
            competition with Huppert for defendant's affections. The record thus
23          discloses that trial counsel's decision was well-considered and reasonable.

24          Further, counsel's decision was not prejudicial. Uy's proposed testimony
            was to impeach Huppert's testimony on the peripheral matters of her
25          knowledge of defendant's relationship with Uy and her participation in
            sexual acts with both men. Huppert was already significantly impeached
26          on these matters. Additionally, Uy's proposed testimony that Huppert had
            a propensity toward violence was contradicted by his prior statements at
27          the preliminary hearing and, accordingly, would not have significantly
            aided the defense. In light of these facts coupled with trial counsel's
28          declaration that Uy's testimony about defendant's past behavior would

                                            27

1    have been "very damaging," defendant cannot demonstrate prejudice
     resulting from trial counsel's decision not to call Uy to testify.

2    ECF No. 45-9, pgs. 34-35.

3

4          As the Appellate Court acknowledges, there were various bases upon which to find

5    defense counsel's decision not to call Uy reasonable including: 1) Uy's likely impeachment upon

6    taking the stand; 2) counsel's opportunity to question Huppert's credibility through cross-

7    examination; and 3) a general determination that having Uy take the stand would have hurt more

8    than helped. It is well established that "[w]hich witnesses, if any, to call, and when to call them, is

9    the epitome of a strategic decision, and it is one that [a reviewing court] will seldom, if ever,

10   second guess." Valenzuela v. Ryan, No. CV-17-01854-PHX-JJT (BSB), 2018 U.S. Dist. LEXIS

11   88324, at *32-33 (D. Ariz. May 24, 2018) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th

12   Cir. 1995)). Petitioner offers no convincing reason for the Court to depart from this principle, nor

13   is one apparent from the record. Therefore, failure to call Uy, or any other impeachment witness,

14   is not sufficient to grant writ relief here, and the state court's decision was neither contrary to nor

15   based on an unreasonable application of the Strickland standard.

16              5.      Failure to Present Character Witnesses

17         Petitioner also argues that defense counsel failed to properly interview potential

18   character witnesses and present them at trial. Petitioner argues that:

19   Counsel did not present any character witnesses to testify about
     [petitioner's characteristics], like kindness, generosity and genuine
20   affection, he had for Ms. Huppert. So, the prosecution easily portrayed
     him as a jealous "Bi-Sexual Porn Star" who went into a rage with an
21   intention to kill. [. . .]

22                          * * *

23   Trial Counsel Jonny L. Griffin, III, failed to investigate and interview 90%
     percent of the witnesses on a list that defendant had given him. Those
24   people were integral to PETITIONER's defense, in order to establish his
     character, versus Ms. Huppert's volatile moods and temper, due to her
25   constant drug-use. This was especially critical because Ms. Huppert's
     false statements had [portrayed] the defendant as an angry man, who just
26   barged in and said, "I'm here to kill you." More troubling is that trial
     counsel had the defendant pay an investigator an extra amount of money
27   for investigation, apart from the monthly attorney fee's [sic], [but] never
     used-anything [sic] at trial. The investigator even suggested, many times,
28   about doing further investigations, but counsel just shunned him. [. . .]

                                              28

1

2                                    * * *

3          Had counsel done these interviews, at the very least, he would have found
           out about the gentle character of the PETITIONER; and the aggressive
4          history of Ms. Huppert, especially with her two (2) Ex-Husband's and
           being ordered to take "anger management" courses by the court (which
5          she admittingly did not do) and Ms. Huppert's addiction to mood altering-
           street drugs. Then counsel could use this information [during] the trial to
6          help the jury grasp an accurate picture of these two people (lovers)
           involved in this mutual combat.

7          ECF No. 17, pgs. 143-145.

8          Respondent argues that none of the declarations of the witnesses were sworn

9   properly and defense counsel's decision not to interview all potential witnesses on petitioner's

10  "list" was tactical as opposed to neglectful. ECF No. 46, pgs. 41-43. Here, the Court agrees

11  insofar that it does not appear objectively unreasonable that defense counsel elected to not

12  produce a witness to testify about petitioner's "kindness" or Ms. Huppert's "aggressive history."

13  First, it appears undisputed that defense counsel did in fact conduct an investigation into potential

14  witnesses from the list of names petitioner gave counsel, albeit not to a degree of petitioner's

15  satisfaction. See ECF No. 17, pg. 144. Given that defense counsel pursued a theory of self-

16  defense and had legitimate reasons to doubt the efficacy of a mutual combat or voluntary

17  intoxication theory (see section (III)(C)(1) above), their decision to ultimately avoid a character

18  dispute appears reasonable.  Any potential witness would have been subject to cross-examination

19  at trial and risked being discredited, thus potentially causing more damage to petitioner's case. As

20  respondent notes, the Appellate Court found that attacking Huppert's violent propensities

21  presented its own risks because ". . . Uy's proposed testimony that Huppert had a propensity

22  toward violence was contradicted by his prior statements at the preliminary hearing and,

23  accordingly, would not have significantly aided the defense." ECF No. 45-9, pg. 35.

24          "There is a 'strong presumption' that counsel's attention to certain issues to the

25  exclusion of others reflects trial tactics rather than "sheer neglect." Harrington v. Richter, 562

26  U.S. 86, 109 (2011) (citing Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1

27  (2003)). To the extent that petitioner feels that defense counsel should have dug deeper into

28  finding and employing a character witness, the Court is not convinced this demonstrates

                                              29

1   egregious error as opposed to a rational, if not successful, strategy.  Accordingly, the Court finds

2   that the state court's determination was neither contrary to nor based on an unreasonable

3   application of <u>Strickland</u>.

4         6.     <u>Failure to Exclude Pornography Career</u>

5         Petitioner also argues that the trial court erred in not granting his motion for a new

6   trial on the ground that his defense attorney failed to object to the admission of evidence that

7   petitioner had been professionally involved in the pornography industry. According to petitioner:

8         The notion of someone being involved in pornography is inherently a
    prejudicial one that has the tendency to turn a jury against that person.
9   People equate pornography, particularly the production of it, with deviant
    sexual behavior. (And, just because you would have a special
10  [questionnaire], geared to a homosexual-base, is even more problematic).
    Such evidence was particularly harmful to someone in [petitioner's]
11  position who testified in his own defense and was trying to get the jury to
    believe his side of the story. [Simply] put, there was a good chance that
12  the jurors were less inclined to believe PETITIONER when they were
    judging him through the jaundiced eye created by that image. Given that
13  the [petitioner's] prior participation in that field-had no relevance to any
    disputed issue in this case, this evidence was clearly inadmissible and
14  would have been excluded had appellant's trial defense counsel objected
    to it, as he should have, but like many other things he chose to throw his
15  client under the bus, so to speak.

16  ECF No. 17, pg. 147.

17        Respondent reiterates the Appellate Court's determination that: 1) defense counsel

18  strategized that petitioner's pornography work bolstered their self-defense theory; and 2)

19  regardless, it was unlikely this disclosure was prejudicial. Specifically, the Appellate Court stated

20  that:

21        We agree with the trial court that defense counsel had a reasonable tactical
    reason for allowing evidence about defendant's pornography career. The
22  defense's theory was that defendant's "fame, attractiveness, and sexual
    prowess" were the reasons Huppert sought to rekindle their relationship
23  and ultimately, reacted with jealousy when defendant told her that he
    loved Uy more than he loved her. According to trial counsel's declaration,
24  "it was important to provide the jury with an explanation as to why []
    Huppert would suddenly attack [defendant]," that is, "the root causes of []
25  Huppert's jealous and violent rage." Counsel declared that in order to
    "counter the prosecution's theory that [defendant] was the aggressor and
26  jealous one, presenting evidence of his work in the pornography industry
    tended to support his belief and trial testimony wherein he testified that 'I
27  can have any woman I want.' " These are reasonable explanations for
    counsel's tactical decision.
28

30

1
2
3
4
5
6

Further, it is unlikely that the testimony about defendant's history working in pornography was prejudicial. There was extensive evidence presented by both the defense and the prosecution about defendant's sexual history. In context, the testimony about defendant's past participation in pornography was not significantly more inflammatory than the detailed testimony about his work as a stripper, his bisexuality, group sexual acts, the sex swing, and related evidence. As the trial court noted, the jurors were extensively questioned during voir dire to ensure that the more explicit evidence would not prejudice defendant. Under these circumstances, it is unlikely that the brief testimony about defendant's work in the pornography industry more than twenty years prior to the instant case resulted in actual prejudice.

7
8

ECF No. 45-9, pg. 35-36.

9   This Court agrees with the Appellate Court's determination. The latitude an

10   attorney has in crafting a legal strategy is broad and a reviewing court must ". . . affirmatively

11   entertain the range of possible reasons [] counsel may have had for proceeding as they did."

12   Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotations omitted)." Petitioner's blanket

13   assumptions towards peoples' opinions of the pornography industry are not a proper basis for

14   finding error in defense counsel's failure to object. Additionally, petitioner offers no convincing

15   argument to suggest this pornography disclosure was particularly prejudicial to his case. As

16   discussed by the appellate court, other potentially "inflammatory" aspects of petitioner's sex-life

17   were revealed throughout trial and the jurors were questioned on these aspects during voir dire to

18   prevent prejudice against petitioner. Petitioner's conclusory argument that his pornography career

19   is nonetheless "inherently prejudicial" is simply insufficient to demonstrate his legal counsel was

20   constitutionally ineffective. See ECF No. 17, pg. 148.  For these reasons, the Court finds the state

21   court's determination was neither contrary to nor based on an unreasonable application of

22   Strickland.

23         7.      No "real Challenge" to Huppert's "Lies"

24   Petitioner argues that:

25
26
27
28

Counsel Attorney Johnny L. Griffin, III'rd's [sic] lack of investigation allowed Ms. Huppert's 18 Lies, under oath to poison the Jury's already biased mind, not only because of those lies, but because of their opinion of a bi-sexual/gay-porn star" and PETITIONER was convicted because of twisted facts of this case. [. . .] Among one of those lies was he claim that she had not washed her hair, which caused the Jury to conclude that all the blood evidence, at the location was hers, when in actuality it was a more

31

1  [exaggerated] version than the true depiction, because it had been water-
2  down. (See RT p. 341-347, officer's testimony . . . after she "washed her
   hair.").

3  ECF No. 17, pg. 149.

4  To the extent that petitioner argues that defense counsel did not put a great enough

5  effort into impeaching Ms. Huppert, the Court disagrees. "Surmounting <u>Strickland</u>'s high bar is

6  never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Establishing that a state

7  court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  The

8  standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply

9  in tandem, review is doubly so[.] When § 2254(d) applies, the question is not whether counsel's

10  actions were reasonable. The question is whether there is any reasonable argument that counsel

11  satisfied <u>Strickland's</u> deferential standard." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011)

12  (internal quotations and citations omitted.)

13  Here, the Appellate Court acknowledged that defense counsel viewed Huppert as

14  "significantly impeached on cross-examination." A review of the record shows that defense

15  counsel did in fact cross-examine Ms. Huppert and covered Huppert's allegedly inconsistent

16  accounting of the incident:

17  Q:      Okay. Thank you, ma'am. So I want to go step-by-step to make
        sure I understand what happened, according to you, that night.
18
   ECF No. 45-1, pg. 100, ln. 11-14.
19
   Q:      Isn't it true that you also, again while in the bathroom swinging,
20      caused the laceration above his right forehead?

21      * * *

22  Q:      Showing you what's been marked for identification as Defendant's
        Exhibit N as in Nancy, do you see the cut above Mr. Donias' left
23      eyebrow?

24      * * *

25  Q:      Isn't it true, ma'am that as you were swinging while standing in
        the tub at Mr. Donias, he grabbed the top portion of the toilet tank and
26      began to use it as a shield?

27  <u>Id.</u> at pgs. 112-13, ln. 9-17 at 112; ln. 1-3 at 113.

28  / / /

1    Thus, it could reasonably be argued that defense counsel made a diligent effort to

2    cross-examine Ms. Huppert and impeach her as necessary to win on their legal strategy of self-

3    defense. Given the extremely deferential nature of <u>Strickland</u>, this is sufficient and petitioner's

4    opinion to the contrary does not warrant granting of writ.  The Court finds the state court's

5    determination of this claim was neither contrary to nor based on an unreasonable application of

6    <u>Strickland</u>.

7    8.    Failure to Capitalize on Juror Contact

8    Petitioner argues that defense counsel demonstrated incompetence when they

9    failed to sufficiently argue against allowing the sitting and alternate juror to continue in their

10   capacities after speaking with a prosecution witness. ECF No. 17, pg. 157.

11   This issue has been discussed above in section (III)(B). The court imports its

12   analysis from section (III)(B) and reiterates that the trial court conducted an adequate hearing on

13   whether the jurors in question could remain unbiased, those jurors confirmed before the judge that

14   they could remain unbiased, and all parties deemed it appropriate to proceed with trial. Therefore,

15   petitioner's arguments here similarly fail because counsel sufficiently argued the issue.  The state

16   court's denial of this claim was neither contrary to nor based on an unreasonable application of

17   <u>Strickland</u>.

18   9.    Failure to Present Different Arguments to the Jury

19   Petitioner argues that counsel's "error [and] omissions [] during closing arguments

20   prejudice petitioner, because without them the result of the trial would have been different." ECF

21   No. 17, pg. 163. According to petitioner:

22   The Trial Counsel (as well as Appellate Attorney) was [i]neffective for not
     challenging, nor bringing up the following issues to help the Jury get a
23   complete picture of the true events that took place, on September 5, 2009.
     That eventually culminated into this domestic-situation ([mutual]-combat)
24   by consent between these two intoxicated lovers[.] By not presenting the
     context of surrounding events in closing arguments and, by not connecting
25   the dots to make sense of the true version of the events, by not creating a
     lesser included/related jury instruction, by not knowing whose blood (for
26   sure) was on the toilet rim, and by allowing the jury to hear that
     PETITIONER [used] to be a porn-star-20 sum odd years earlier,
27   [amongst] other things mention in this writ, led the jury by the nose to
     assume, that Ms. Huppert's version of events was true and not that of the
28   PETITIONER's.

33

ECF No. 17, pg. 163.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers." Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (internal citations omitted). Judicial review of a defense attorney's summation is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas. Id.

Petitioner's argument here is simply a summarized amalgamation of all the arguments made in his petition. According to petitioner, defense counsel failed because his closing argument did not touch on the various issues he addressed in this petition including: 1) a legal theory of mutual-combat; 2) petitioner's intoxication defense; 3) a decision to not address lesser/related offenses; 4) an alleged lack of investigation into blood evidence; 5) his "porn-star" past; and 6) Ms. Huppert's credibility, generally. All of these issues have been addressed throughout this Opinion. For the reasons given therein, the Court finds that this argument does not warrant granting petitioner's petition because the state court's determination was neither contrary to nor based on an unreasonable application of Strickland.

10.    Failure to Investigate Prescription Drug Side Effects

Petitioner argues that defense counsel failed to investigate the side-effects of the prescriptive drug medication that petitioner was taking at the time of the incident with Ms. Huppert. According to petitioner:

There was NO-ATTEMPT-TO-MURDER, because Ms. Huppert, physically attacked the PETITIONER, now, he may have over-reacted in his out-of-character response to the situation. However, he had never been violent with Ms. Huppert before, according to her own testimony, until she invited (called) him over to set a trap for him to seek-revenge and the "only" thing that convinced the jury of the "attempted-murder" charge was all of her lies that she falsely was allowed to present; [s]he knew that the truth would be seen as a mutual-combat situation, instigated by her (and so did the D.A.), but the Police report shows the real truth of the matter, for the most part.

34

* * *

> Had Counsel Johnny L. Griffin, III, done any investigations, he would
> have discovered that PETITIONER'S prescription drugs, combined with
> alcohol was the real cause of any out-of-character reaction in defending
> himself to her physical attacks, and because as so many times before,
> PETITIONER refused to get involved in any kind of questionable
> situation with her, due to her volatile-nature. [. . .]

ECF No. 17, pgs. 169-170.

Respondent argues that: 1) the Sixth Amendment does not require counsel to consider (or to investigate) all possible ways to defend; 2) a fair-minded jurist could reject, as truly implausible, petitioner's post-hoc suggestion that counsel's investigation did not include "interview[ing]" him; 3) nothing proffered to the state court included information that petitioner's use of any prescription medication had changed, such that any reaction thereto plausibly could be viewed as a change from his "normal" reaction to being allegedly assaulted; 4) it was hardly well-established whether "voluntary and knowing ingestion of prescription medication" amounted to "voluntary or involuntary intoxication" under state law; and 5) proof of prejudice required petitioner to proffer declarations reflecting the actual "helpful testimony for the defense" that unquestionably had to be presented at trial. See ECF No. 46, pgs. 46-47.

Recognizing the doubly deferential standard of § 2254(d) and Strickland, the Court finds that a reasonable argument can be made that defense counsel acted appropriately in declining to pursue a theory of a drug-induced, "out-of-character response."  As discussed above, defense counsel's decision to pursue a theory of self-defense and focus on Huppert's misconduct was a rational choice. Mr. Griffin noted in his declaration that ". . .Mr. Donias advised [counsel] that he was intoxicated and may have blacked out during the incident and really could not provide an exact 'blow by blow' account of his actions in defending himself. Therefore, the tactical and strategic decision was made not to focus on Ms. Huppert's injuries or how they occurred, but to instead focus on Ms. Huppert' s jealous rage in attacking Mr. Donias and his need to defend himself." ECF No. 45-2, pg. 89. Insofar as petitioner believes that counsel should have instead focused on his drug-induced "reaction", the Court recognizes that "just because counsel did not come up with all potential ways to prove the case does not make the counsel's performance

35

1    ineffective." Gonzalez v. Wong, 667 F.3d 965, 992 n.14 (9th Cir. 2011).

2            Alternatively, defense counsel had good reason to avoid discussing petitioner's

3    drug use during trial. Involuntary intoxication that results in unconsciousness may be a complete

4    defense to a crime. People v. Mathson, 210 Cal. App. 4th 1297, 1313 (2012). However, "[t]he

5    question of whether intoxication is voluntary or involuntary focuses on whether the intoxication is

6    induced through the defendant's fault or the fault of another or whether the defendant knows or

7    has reason to anticipate the intoxicating effects of the substance he or she ingests." Given how

8    petitioner openly admitted to combining prescription medication with excessive consumption of

9    alcohol, it would have been reasonable for defense counsel to doubt such a theory's success.

10           Lastly, in the event petitioner does overcome the deference afforded to defense

11   counsel under Strickland, petitioner has nonetheless failed to show prejudice. Petitioner holds the

12   affirmative burden to show that "there is a reasonable probability that, but for counsel's

13   unprofessional errors, the result . . . would have been different." Strickland, 466 U.S. at 694. "It is

14   not enough 'to show that the errors had some conceivable effect on the outcome of the

15   proceeding.'" Richter, 562 U.S. at 104, (quoting Strickland, 466 U.S. at 693).  Here, petitioner

16   simply makes a blanketed, unsupported assumption that this "[new evidence] would have added

17   an entirely new dimension to the jury's assessment of the victim's testimony." ECF No. 17, pg.

18   171 (internal quotations omitted). However, petitioner does not explain how defense counsel

19   would have acquired useful testimony regarding this theory, nor how it would have made a

20   difference.  As respondent notes:

21           Absent were declarations from any experts purporting to explain how trial
             counsel should have known how to locate them, that they would have been
22           realistically available to trial counsel at the time of trial, and just what
             opinions they would have recounted at trial that were admissible.
23

24           ECF No. 46, pg. 47.

25           Since petitioner cannot show that his drug-fueled "out-of-character" conduct

26   theory would have likely produced a different result, petitioner has failed to satisfy his burden.

27   See Richter, 562 U.S. at 112.  Either because defense counsel's strategy was reasonable or

28   because petitioner cannot demonstrate prejudice, the state court's denial of this claim was neither

1    contrary to nor based on an unreasonable application of Strickland.

2                    11.    Failure to Challenge "Blood-Evidence" at Preliminary Hearing

3            Petitioner argues that defense counsel was incompetent because:

4            He failed to bring any challenge to the "Blood-Evidence", "Blood-
             Splatter" at preliminary hearing and/or "Blood-Drops" on the walk-way,
5            which had only been introduced by photographic-evidence "only"
             [without] any testing after collection by the crime location investigation
6            and/or did he bring any challenge to such evidence being introduced at
             trial in this manner.
7
                              *    *    *
8
             The Prosecution, in this case, introduced photographic-blood-evidence,
9            but did not validate it as either the PETITIONER'S and/or the alleged
             Victim. It was merely assumed by the depiction of events given by the
10           Victim . . . that the blood was her own. [. . .]

11                            *    *    *

12           Clearly, the PETITIONER was injured, and "Blood-Evidence" in the form
             of photos were used by the prosecution to bind the
13           defendant/PETITIONER over for a Criminal Trial at the Preliminary
             Hearing, without having determined whether the photos of the "Blood"
14           was in fact the blood of the alleged victim. The members of the Jury also
             saw this selfsame evidence for inspection and it is reasonable to posit that
15           "Such-Evidence" swayed the overall decision to find the defendant, now
             PETITIONER, guilty.
16
             ECF No. 17, pgs. 189-192.
17

18           The Court here is unconvinced. Petitioner does not contend that defense counsel

19   conceded that the blood in the photograph or the "blood-evidence" generally belonged to the

20   victim.  As petitioner himself concedes, neither side established whose blood was in the

21   photograph, and both petitioner and Ms. Huppert testified before the jury that they were attacked

22   and bloodied at Ms. Huppert's residence as a result of the physical altercation. See ECF No. 17,

23   pg. 190. Petitioner admits that he "testified that he was in fact injured and bled profusely. Id.

24   Thus, the jury could just as easily have made a finding that the "blood-evidence" bolstered

25   defendant's self-defense theory. That the jury ultimately found that theory unconvincing is

26   irrelevant given the deference afforded to defense counsel under both § 2254(d) and Strickland.

27   From this, it is not certain that defense counsel's failure to object to the "blood-evidence's"

28   consideration essentially meant "taking sides with [Ms. Huppert]". Id. at 191.

                                              37

1    Also, petitioner has failed to show how defense counsel's alleged failure to

2    properly deal with this "blood-evidence" prejudiced his case. It is insufficient for petitioner to

3    simply state that "it is reasonable to posit that 'Such-Evidence' swayed the overall decision [of

4    the jury]." Petitioner must affirmatively demonstrate that a different outcome was not just

5    plausible, but "reasonably likely." Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 696)

6    As is clear from the petition, petitioner has failed in his burden. Again, either because defense

7    counsel's strategy was reasonable or because petitioner cannot demonstrate prejudice, the state

8    court's denial of this claim was neither contrary to nor based on an unreasonable application of

9    Strickland.

10         **D.    Ineffective Assistance of Appellate Counsel**

11    Petitioner argues that his Sixth Amendment right to effective appellate counsel

12    was violated by appellate counsel's incompetence regarding various habeas petition issues such

13    as: 1) failing to timely file a habeas petition along with the direct appeal; 2) bringing up the issues

14    which trial counsel failed to properly address such as lesser/related offenses and an intoxication

15    theory; 3) appellate counsel's failure to "listen"; 4) "[dragging] his feet" in submitting a habeas

16    petition; and 5) failing to consider issues "out-side-the record", which petitioner addressed in this

17    petition. ECF No. 17, pgs. 183-185.

18    The Strickland standards also apply to appellate counsel. See Smith v. Robbins,

19    528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882

20    F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional

21    right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel,

22    as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463

23    U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.

24    Otherwise, the ability of counsel to present the client's case in accord with counsel's professional

25    evaluation would be "seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274

26    n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary,

27    and is not even particularly good appellate advocacy.")  Further, there is, of course, no obligation

28    to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88.  Thus,

1   counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to

2   demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors,

3   he probably would have prevailed on appeal.  See id. at n.9.

4               As is evident from the petition, the ineffectiveness claim here stems not from

5   counsel's pursuit of appellate relief, but instead on a failure to discuss the issues petitioner now

6   raises in his habeas petition. Essentially, this is a claim of ineffective counsel in seeking habeas

7   relief cloaked in the language of ineffective "appellate counsel." As petitioner notes:

8               In its decision the Superior Court [. . .] denied the issue of ineffective
            assistance of counsel (appellate) because it reasoned "The appellate
9           counsel could not have been ineffective for failing to include arguments
            that PETITIONER raised in this petition (IAC of Trial Counsel) in his
10          appeal or earlier habeas [. . .] Albeit the Superior Court is correct about
            counsel being bound by the record on appeal, but he is obviously wrong
11          about habeas corpus, because it often contains issues not on the record,
            especially with IAC Issues.
12
            ECF No. 17, pg. 180-181
13

14              Petitioner's ineffective assistance of counsel claim here is rooted on issues not on

15  the record of his initial appeal, such as lesser/related jury instructions and intoxication as a

16  defense. Id. at 183. Therefore, the claim rests on postconviction relief.  However, as respondent

17  correctly points out:

18              [Petitioner] had "no federal constitutional right to counsel [when]
            seeking state postconviction relief." Murray v. Giarratano, 492 U.S.
19          1, 7-8 (1989). And since he "had no constitutional right to counsel,
            he could not be deprived of the effective assistance of counsel."
20          Wainwright v. Torna, 455 U.S. 586, 588 (1982). After all, "it is not
            the gravity of the attorney's error that matters, but that it constitutes
21          a violation of petitioner's right to counsel." Coleman v. Thompson,
            501 U.S. 722, 754 (1991).
22
            ECF No. 46, pg. 49.
23

24              Therefore, the state court's denial of this claim was neither contrary to nor based

25  on an unreasonable application of Strickland and petitioner is not entitled to habeas relief due to

26  ineffective appellate counsel.

27  / / /

28  / / /

1        **E.        Systematic Challenges**

2                Petitioner goes through a lengthy and unclear analysis of prior Supreme Court

3   cases and changes to the California Constitution which have nebulous, if any, connections to his

4   current habeas petition. (ECF No. 17, pgs. 196-227)

5                As mentioned above, federal habeas relief under 28 U.S.C. § 2254(d) is not

6   available for any claim decided on the merits in state court proceedings unless the state court's

7   adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an

8   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

9   of the United States; or (2) resulted in a decision that was based on an unreasonable determination

10  of the facts in light of the evidence presented in the State court proceeding. The Court has already

11  determined that the facts presented in the State court proceeding do not warrant granting writ

12  relief here. Also, to the degree petitioner is attempting to present Supreme Court precedent which

13  shows that changes to the California Constitution violated his right, this Court is unconvinced. As

14  respondent correctly notes:

15              [Petitioner] cites McNeil v. Wisconsin, 501 U.S. 171, 181 n.2 (1991) to
                challenge a requirement of discovery from the defense (ECF 17 at 196),
16              which the Constitution does not bar. Troiani v. Poole, 858 F. Supp. 1051,
                1057-59 (S.D. Cal. 1994). And Carmell v. Texas, 529 U.S. 513 (2000)
17              speaks to post-crime reduction in evidence needed to convict (ECF 17 at
                197), but there was no showing of a change in California law after
18              Petitioner committed his crime. And Miller v. French, 530 U.S. 327
                (2000) on rules of separation of federal powers (ECF 17 at 198), is
19              unhelpful to challenge a State's exercise of its powers. See Sweezy v.
                State of N.H. by Wyman, 354 U.S. 234, 255 (1957).
20
                ECF No. 46, pg. 49.
21

22              Also, petitioner appears to argue that two California changes, Propositions 8 and

23  115, violated his constitutional rights by being "Bills of Attainder." ECF No. 17, pg. 199. Bills of

24  Attainder are barred by the Constitution and are defined as a law that legislatively determines

25  guilt and inflicts punishment upon an identifiable individual without provision of the protections

26  of a judicial trial. Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977); USCS Const. Art. I,

27  § 9, Cl 3. Here, it is undisputed that petitioner was granted a jury trial presided over by a judge,

28  was duly convicted by that jury, and whose punishment was thereafter rendered by a judge. To

                                                40

the extent that petitioner challenges the constitutionality of that trial for the various reasons laid out in his petition, the Court has reviewed the record and finds that he was in fact granted all judicial rights afforded to him by the Constitution.  The Constitution requires a fair trial, not a perfect trial, and the record here demonstrates petitioner's trial was fair.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

41

1

### IV. CONCLUSION

2       Based on the foregoing, petitioner's petition for a writ of habeas corpus is denied.

3 Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the Court has

4 considered whether to issue a certificate of appealability.  Before petitioner can appeal this

5 decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c); Fed. R. App. P.

6 22(b).  Where the petition is denied on the merits, a certificate of appealability may issue under

7 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

8 constitutional right."  28 U.S.C. § 2253(c)(2).  The Court must either issue a certificate of

9 appealability indicating which issues satisfy the required showing or must state the reasons why

10 such a certificate should not issue.  See Fed. R. App. P. 22(b).  Where the petition is dismissed on

11 procedural grounds, a certificate of appealability "should issue if the prisoner can show: (1) 'that

12 jurists of reason would find it debatable whether the district court was correct in its procedural

13 ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid

14 claim of the denial of a constitutional right.'"  Morris v. Woodford, 229 F.3d 775, 780 (9th Cir.

15 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)).  For the reasons

16 set forth above, the Court finds that issuance of a certificate of appealability is not warranted in

17 this case.

18       Accordingly, IT IS HEREBY ORDERED that:

19       1.     Petitioner's petition for a writ of habeas corpus (ECF No. 17) is denied;

20       2.     The Court declines to issue a certificate of appealability; and

21       3.     The Clerk of the Court is directed to enter judgment and close this file.

22

23 Dated:  May 28, 2020

24                     DENNIS M. COTA

25                     UNITED STATES MAGISTRATE JUDGE

26

27

28